UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

            Plaintiff,            No. 2:23-cr-7

    vs.                        Hon. Robert J. Jonker
                                      United States District Judge

NATHAN WEEDEN,

            Defendant.
_____/

<u>GOVERNMENT'S SENTENCING MEMORANDUM AND MOTION FOR UPWARD VARIANCE</u>

May it please the Court, the United States submits this memorandum for the Court's reference in determining an appropriate sentence:

1. <u>The Defendant's Conduct</u>

On September 21, 2019, defendant Nathan Weeden desecrated Temple Jacob, a synagogue in Hancock, Michigan, by spray painting on its walls swastikas and runes associated with "The Base"—a neo-Nazi organization of which Weeden was an active member. Defendant Weeden took these actions as a part of a conspiracy within "The Base" to deprive non-white and Jewish American's of their property rights during a self-described "Operation Kristallnacht," named after the infamous night of broken glass in 1938 Nazi Germany. The conspiracy originated from co-conspirator Richard Tobin's call to action, and on the same date as defendant Weeden, co-conspirator Yousef Barasneh took similar action by desecrating the Temple Beth Israel Sinai in Racine, Wisconsin.

On January 25, 2024, defendant Weeden was convicted at trial on both counts: 18 U.S.C. § 241 conspiracy against rights and 18 U.S.C. § 247(c) damage to religious property. This Court

1

ordered that the defendant be held pending sentencing due to the danger he poses to the community. Since the facts are well known to the Court that presided over the trial against defendant Weeden, this memorandum will highlight only testimony and exhibits most pertinent to the statutory sentencing factors.

Unlike defendant Weeden, both Tobin and Barasneh took responsibility for their actions and pleaded guilty to violating 18 U.S.C. § 241 conspiracy against rights. Tobin was sentenced to 12 months and 1 day of incarceration, 3 years of supervised release, $7,000.00 in restitution, 150 hours of community service. Barasneh cooperated and testified during defendant Weeden's trial, and was sentenced to 2 years of probation, 150 hours of community service, and participation in programs aimed at countering hatred and bias.

2. Guideline Calculations

The sentencing guidelines are "effectively advisory" but still must be consulted and "taken into account when sentencing." *United States v. Booker*, 543 U.S. 220, 245, 264 (2005). The final Presentence Investigation Report (PSR) correctly calculates the sentencing guidelines as a Total Offense Level of 17, criminal history category of I, resulting in a guideline imprisonment range of 24-30 months. *See* PSR ¶¶ 26-50, 78.

The PSR properly applies the hate crime motivation under USSG § 3A1.1, without objection. *See* PSR ¶¶ 29, 35. This provision attaches when "the finder of fact at trial . . . determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, [or] ethnicity . . . of any person," USSG § 3A1.1(a), and expressly "applies to offenses that are hate crimes." *Id*. at n.1. This enhancement applies to Weeden

because the jury found him guilty beyond a reasonable doubt of intentionally defacing and damaging Temple Jacob *because of the race, color, or ethnic characteristics of any individual associated with that property*.  See ECF No.1, PageID.4 (Indictment); ECF No.63-1, PageID.335 (Order re: Damage to Religious Property Count Jury Instruction).  Similarly, the conspiracy count required the jury to find that "the defendant specifically intended to hinder, prevent, or interfere with Jewish citizens' right to hold and use real and personal property free from discrimination."  ECF No.56, PageID.251 (Jury Instructions).

Upon the government's recommendation, the final PSR separates Counts 1 and 2 into different groups.  *See* PSR ¶¶ 39-45; *see also* ECF No.72, PageID.365-69 (Gov't Resp. to Initial PSR).  This analysis is correct because the conspiracy for which Weeden was convicted in Count 1 was far broader than the substantive crime in Count 2, and did in fact result in distinct harms to two separate synagogue congregations in Michigan and Wisconsin.  Because only one of those substantive offenses is accounted for in the sentencing calculations for Count 2, the conspiracy reaches beyond the "single criminal objective" with "essentially one composite harm to the same victim" contemplated under USSG §3D1.2.  USSG §3D1.2, n.4; *see also* USSG § 1B1.2(d) (clarifying that a "conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit").

3. <u>Statutory Sentencing Factors and Relevant Legal Principles</u>

In determining an appropriate sentence, the court must consider the 18 U.S.C. § 3553(a) factors and impose a sentence sufficient, but not greater than necessary, to comply with the purposes of this statute.  These factors include the nature and circumstances of the offense and

3

the history and characteristics of the defendant (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense (18 U.S.C. § 3553(a)(2)(A)); the need for the sentence imposed to afford adequate deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B)); the need for the sentence imposed to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(C)); and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. (18 U.S.C. § 3553(a)(6)).

The Guidelines "seek to embody the Section 3553(a) considerations, both in principle and in practice." *Rita v. United States*, 551 U.S. 338, 350 (2007). However, a sentencing court may not "presume that a sentence within the applicable Guidelines range is reasonable," but must consider the § 3553(a) factors. *Nelson v. United States*, 555 U.S. 350, 352 (2009). Additionally, the court may consider "factual matters not determined by a jury . . . to increase the sentence in consequence." *Rita*, 551 U.S. at 352; *see also BMW of North America, Inc. v. Gore*, 517 U.S. 559, 573, n. 19, (1996) ("A sentencing judge may even consider past criminal behavior which did not result in a conviction"); *Williams v. New York*, 337 U.S. 241, 69 (1949) ("Highly relevant—if not essential to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics").

So long as the length of the sentence imposed "is reasonable in light of the § 3553(a) factors[,]" a court may vary upward from the guidelines range. *United States v. Tate*, 516 F.3d 459, 469 (6th Cir. 2008). Similarly, "there is no presumption *against* a sentence that falls

4

outside of the range[,]" *id.*, at 469-70 (emphasis in original), and any sentence imposed, "whether inside, just outside, or significantly outside the Guidelines range" is reviewed "under a deferential abuse-of-discretion standard." *Id.*, at 470, quoting *Gall v. United States*, 552 U.S. 38 (2007).

4. <u>Statutory Sentencing Factors Applied to Weeden Necessitate an Upward Variance</u>

An upward variance is warranted because Defendant Weeden's guideline range does not adequately capture the nature and extent of his offenses, his persistent dedication to violent neo-Nazi ideology, his prior illegal conversion of a rifle to a fully automatic weapon, his lack of remorse, the resultant danger he poses to the community, or the need for general and specific deterrence.

Ultimately, unlike his two co-conspirators who took responsibility for their actions, defendant Weeden tried to get away with his crimes, and continued to post racially hateful comments even after being charged with the federal hate crimes at issue in this case. Therefore, this Court should vary upward from the guidelines range and impose a sentence of at least 36 months incarceration, 3 years supervised release, community service, and participation in anti-hate counseling or other similar programs.

A. <u>The § 3553(a) Factors Support an Upward Variance to Adequately Reflect the Severity of Defendant's Offense</u>

Weeden's offense is more severe than terrorizing an entire congregation; and vastly greater still than vandalizing a single building. This was a calculated threat against an entire people group, using the symbol of mass extermination, and the offense was carried out as a part of a broader operation intended to instill fear and terror among minorities across the country by implementing a second "Kristallnacht." The guidelines do not fully take into account

the gravity of this particular conspiracy, and therefore an upward variance is warranted based on the nature and circumstances of the offense, as well as the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

This Court heard testimony at trial from two victims of Temple Jacob, seeing their emotion first-hand as they described the deep and long-lasting terror Weeden's crimes inflicted upon them. The defendant's actions signaled to them that he knew where they were, wanted them dead, and believed that six million Jews killed during the holocaust was not enough. Those witnesses further testified that in response to this overt threat and attack on their faith, they had no choice but to turn their sacred Temple into a fortress, radically upgrading security procedures. They installed cameras and protective coverings for their historic stain glass windows, and hired armed security during their High Holy Days. Tragically, this defendant forced them to permanently lock their doors, requiring text messages and visual checks through newly installed peep holes prior to letting anyone in.

Moreover, the defendant's actions were part of a conspiracy—referred to by the participants as "Operation Kristallnacht"—aimed at spreading terror not only among the congregants of the Temple Jacob synagogue, but also among minorities across the country. This conspiracy explicitly included more than just vandalism, as Tobin's war cry encouraged conspirators to smash glass, slash tires, spray paint the symbol of The Base, "burn whatever you please," and to act "with tenacity and ruthlessness." (Gov't Ex. 19.) Additionally, this operation was billed as merely "the first step in the gradual escalation that will lead to our domination of this filthy country." (Gov't Ex. 18.) The FBI believes that, at the time of this conspiracy, The

Base had members in approximately 22 states. If more members had embraced the plan, as both Weeden and his co-conspirators had hoped, the impact would have been catastrophic. While it is fortunate that only two members struck their targets, this in no way mitigates the culpability of the two conspirators who did act, and who did so with the express intent to enact a broad-scale attack.

Defendant Weeden's punishment should account for the true intention and scope of the conspiracy. The standard guideline range does not fully capture the extremity of this particular conspiracy, and thus an upward departure is necessary to account for the nature, circumstances, and seriousness of the offense, and to provide just punishment for Weeden's crimes.

    B. <u>The § 3553(a) Factors Support an Upward Variance to Adequately Reflect the Danger Weeden Poses, and to Send a Message that Such Conduct Will Not be Tolerated</u>

Similarly, an upward variance is necessary to reflect the history and characteristics of this particular defendant, the need to impose a sentence sufficient to protect the public, and to deter him and other likeminded people.

Despite Probation's suggestion that Weeden's youth, lack of substance abuse, and lack of education or employment issues might support a sentence below the guidelines range, *see* PSR ¶ 96, the evidence shows that Weeden is unrepentant, unstable, and poses an ongoing threat to the Jewish community and society as a whole. The evidence at trial and additional evidence provided to this Court after trial overwhelmingly establishes that Weeden has long harbored deep-seated racist views, has fantasized about lashing out in violence, was implicated in a bomb threat, and has gone so far as to actual modify one of his rifles into a fully automatic weapon.

Defendant Weeden's first run-in with law enforcement came at the age of 18 when he posted on his iFunny account about a bomb threat.  Shortly after FBI agents responded and interviewed him about this incident, Weeden made another post on iFunny, saying, "Apparently some liberal kid made a fake ass tip on me, so FBI niggas came to ask me questions and were like 'hey can you show us your gun safe' so I did and they fucked off.  Stop wasting my time and tax dollars you binches (sic)."  When he interviewed to join The Base, he espoused racial animosity, expressing among other things the desire to rebuild society and not let the Jews into the group's coveted white "ethnostate."  His social media and Wire postings were rife with racist content, idolizing Adolf Hitler and mocking people based on race and sexual orientation.  And his vitriol went further, fantasizing about violence against Jews and other minority groups.  Emblematic of this vitriol, when a fellow Base member posted a link about an arson at a synagogue in Duluth, MN, Weeden commented that the "Midwest gang gotta step it up." (Gov't Ex. 14, 17.)

Weeden celebrated his contributions to "Operation Kristallnacht" by bragging to his co-conspirators—writing "I did! Went good! Got articles written!!" (Gov't Ex. 30)—and then laughed off criticism for messing up The Base's logo.  Not only did he show no remorse, he was proud that his desecration hit the news, extending the reach of his threats to a wider audience as the conspirators had envisioned.  Then, when confronted by the FBI and given opportunities to take responsibility, Weeden remained evasive, treating the entire ordeal as flippantly as a "game of poker" and not wanting to "show his hand to another" without guarantees for himself.  (Gov't Ex. 56.)

Additional evidence highlighted for this Court at the detention hearing post-trial further supports the need for an upward variance.  First and foremost, Weeden converted a semi-automatic rifle into a fully automatic weapon and fired it numerous times in 2019 and 2020, around the time he joined the "Operation Kristallnacht" conspiracy.  During a search of Weeden's cell phone, the FBI discovered a video of him firing this rifle, ending with a message reading, "Fuck the Feds. Fuck the NFA.  Live Free Die Free, I'm the Jokah babey.  ATF suck my nuts."  The FBI interviewed some of Weeden's former acquaintances who had been to the gun range with Weeden and confirmed that this was in fact him in the video and that he had inserted a special link into his Ruger MPR rifle to render it fully automatic.  One acquaintance described having purchased a 3D printer with Weeden and having printed about a dozen drop-in auto sears ("DIAS"), which are devices that convert a semi-automatic weapon into a fully automatic weapon.  Weeden printed many of these devices in his own apartment, where he also modified his Ruger MPR rifle by putting in a different bolt carrier group and trigger group in order to make it compatible with the DIAS.

Relatedly, the FBI found on Weeden's phone several gun schematics labeled, "Expedient Homemade firearms."  These included instructions on how to make a 12-guage pistol, a BSP semi-automatic submachine gun, a silenced pistol, and a pen gun.  Given that Weeden has download at-home weapon-making instruction manuals, and is an engineer who knows how to print and modify weaponry to make fully automatic rifles and has actually done so in the past, he poses an ongoing threat in this regard—a threat that is not mitigated by simply seizing a particular rifle or even by prohibiting him from legally owning a firearm.

Troublingly, the search of Weeden's cell phone also uncovered a document containing a list of 35,037 names written in Hebrew with accompanying addresses and other contact information.  Even after Weeden was arrested for federal hate crimes, he continued to make racially charged posts, showing his lack of remorse and establishing that he maintains his white-supremacist ideologies that led him to lash out at Temple Jacob.

In sum, this Court took many of these same factors into account—sharing the government's concern that Weeden poses a threat to the community and is unrepentant—when it ordered Weeden's detention pending sentencing.  These same concerns are ongoing and warrant an upward variance in order to protect the public against future action by him, to rehabilitate him, and to deter like-minded individuals from engaging in similar behavior.  With this sentence, this Court should send a message to Weeden and others inclined to follow in his footsteps that such egregious criminality will not be tolerated in a free society.

5. Conclusion

For the reasons set forth above, the government respectfully requests that this Court impose a sentence of at least 36 months of incarceration, followed by 3 years of supervised release.  The government additionally recommends that the defendant be ordered to community service, and to participate in anti-hate counseling or other similar programs.  Finally, the Court should order restitution in the amount of $1,466.17 to Temple Jacob to cover the costs associated with repairing and fortifying their synagogue.  18 U.S.C. § 3663A; USSG §5E1.1; PSR ¶ 91-2.

        Respectfully submitted,

        KRISTEN M. CLARKE
Assistant Attorney General
United States Department of Justice
Civil Rights Division

MARK A. TOTTEN
United States Attorney

Dated: May 21, 2024        */s/ Eric Peffley*
ERIC PEFFLEY
Trial Attorney
United States Department of Justice
Civil Rights Division
Criminal Section
150 M St. NE, Ste. 7.000
Washington, D.C. 20002
(202) 353-5173
*eric.peffley@usdoj.gov*

*/s/ Nils R. Kessler*
NILS R. KESSLER
Assistant United States Attorney
P.O. Box 208
Grand Rapids, MI 49501-0208
(616) 456-2404
*nils.kessler@usdoj.gov*